JAY R. KELLEY AND GAIL B. KELLEY, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent; JAY R. KELLEY (AS TRANSFEREE OF INSULATION CONTRACTORS, INC.), Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Kelley v. Commissioner
Docket Nos. 23020-88, 32292-88
United States Tax Court
T.C. Memo 1991-324; 1991 Tax Ct. Memo LEXIS 373; 62 T.C.M. (CCH) 136; T.C.M. (RIA) 91324; July 16, 1991, Filed *373 Decisions will be entered under Rule 155. Held: One petitioner, as an individual and as a transferee, is liable for additions to tax under section 6653(b). Held further: Statute of limitations is open for years at issue. Held further: Bonus constitutes taxable income in 1981 to individual petitioners. Held further: Individual petitioners may not deduct partnership loss on their 1981 return. Samuel R. McCord, for the petitioners. John F. Driscoll, for the respondent. WHITAKER, Judge. WHITAKER
MEMORANDUM FINDINGS OF FACT AND OPINION Respondent determined deficiencies in, and additions to, petitioners' Federal income tax as follows: Additions to Tax
Petitioners [1]
Year
Deficiency
Sec. 6653(b) [2]
Interest
Jay R. Kelley &
1980 $  87,456.00
$ 61,972
Gail B. Kelley
1981 $ 154,392.00
$ 77,196
Jay R. Kelley
(as Transferee of
FYE
Insulation
5/31/81
$ 143,273.00
$ 71,637
$ 178,816.10
Contractors, Inc.)
*374 After concessions by the parties, the issues before us are: (1) Whether petitioner Jay R. Kelley (Mr. Kelley) [3] is liable for the additions to tax under section 6653(b); (2) whether the notices of deficiency are barred by the statute of limitations; (3) if the answer to question (2) is in the negative, whether petitioners in docket No. 23020-88 are liable for 1981 income tax on income in the amount of $ 90,000 for a wage/bonus payment; and (4) if the answer to question (2) is in the negative, whether petitioners in docket No. 23020-88 may deduct a partnership loss on their 1981 return. FINDINGS OF FACT Some of the facts have been stipulated and are so found. The individual petitioners in these consolidated cases resided in Alabama when their petition was filed. Mr. Kelley was in the insulation business. Commercial and Industrial Insulation Co., Inc. (C & I), *375 was incorporated by Mr. Kelley in 1968 as a commercial and industrial insulation contractor through which he carried on his business. C & I handled only union contracts. Mr. Kelley owned 100 percent of the corporation's stock. To maintain the corporate books, C & I initially employed the bookkeeping services of petitioner Gail B. Kelley (Mrs. Kelley) and an outside accountant. In November 1969 C & I employed James V. Haynes as the full-time bookkeeper for C & I. At that time, the business maintained a small, family run office. Insulation Contractors, Inc. (IC), was formed in 1974 to handle nonunion jobs. C & I was the management company for IC. Mr. Kelley owned 100 percent of IC's stock, and Mr. Haynes was the bookkeeper for IC also. Mr. and Mrs. Kelley were the only people with checkwriting authority at that time. Mr. Haynes' job responsibilities as bookkeeper for both corporations were to record invoices on material purchases by posting them in the appropriate ledger maintained in a journal, do the payroll, and generally maintain the books of the corporate accounts. The bookkeeping systems of the two corporations were substantially identical and were comprised of the *376 following books of account: A general ledger, an accounts receivable ledger, an accounts payable ledger, a cash disbursements journal, a cash receipts journal, a billing register, and job cost sheets. A purchase order system was used to organize the books in relation to the various jobs that the corporations were handling at any one time. When an order for materials was placed by one of the corporations in connection with a job, a special job code was placed on the purchase order so that, when Mr. Haynes received an invoice for payment, it could be identified in connection with that job. If there was no purchase order for a particular invoice, Mr. Haynes would inquire of other employees and, if he did not know how to charge the item, he would ask Mr. Kelley. After the item was charged in the invoice register to the proper job, it was posted in a chronological listing of such items, called "job cost sheets." Labor expenses were also contained in this chronological listing. Accounts were set up to reflect personal transactions between Mr. Kelley and the two corporations: Money loaned by the corporations to Mr. Kelley was recorded in the "accounts receivable officers" accounts; sometimes *377 Mr. Kelley loaned money to the corporations and these loans were reflected in other accounts. At times the corporations made payments on behalf of Mr. Kelley for insurance or paid cash advances to him. When these occurred, Mr. Haynes either knew how to charge the various personal accounts or, if he did not, he would discuss them with Mr. Kelley. When a salary or bonus accrued to Mr. Kelley, portions of these amounts sometimes were set off in the corporate accounts against an obligation Mr. Kelley owed to one of the corporations. At the close of IC's fiscal year, May 31, 1979, IC's books showed that IC owed Mr. Kelley $ 181,614. By the end of the next fiscal year, that obligation had been reduced to zero. For several years, the business of the corporations remained fairly small. Then, in July 1979, IC (the open shop) was awarded a very large job in Prattville, Alabama, called the "Union Camp" job. At first one of C & I's vice presidents appears to have been in charge, and Mr. Kelley was not in Prattville on a daily basis. However, after being warned in October 1979 that IC was about to lose the job unless things were turned around, the whole office, including Mr. Kelley and *378 Mr. Haynes, moved temporarily to Prattville. Mr. Kelley was on site and much more involved in the day-to-day operations than he had been previously for other, smaller insulation contracts. By the spring of 1980 it was clear that IC would be able to complete the job. In early 1980 while the Union Camp job was continuing, Mr. Kelley reassigned one of IC's employees, Elvin Hullett, to supervise the construction of a personal residence for Mr. Kelley located on Marsh Mountain Road. Mr. Kelley's old residence was on Etowah Street. Construction of Mr. Kelley's new residence began on March 1, 1980. While acting as foreman on the house construction, Mr. Hullett was authorized by Mr. Kelley to make purchases of materials to be used in the house construction, and Mr. Kelley instructed him to have the materials billed to IC. Mr. Kelley indicated that he wanted the purchase invoices to be marked "Union Camp Job." This is in fact what occurred in most cases. He did not explain to Mr. Hullett his reasons for requiring this, but Mr. Kelley was adamant about it. Certain other personal expenses for the Kelleys were paid for by C & I and were run through C & I's books. It seems that the corporate *379 records were carefully documented to make it appear as though the house expenses were incurred in connection with the Union Camp job. On one occasion when an invoice for house materials was not marked "Union Camp," Mr. Kelley became angry. In another case in connection with the installation of gutters in December 1980, the contractor's proposal and original estimate referring to "gutters" on Mr. Kelley's house were changed at the instruction of someone at IC so that the proposal referred to "metal fabrication" for the Union Camp job. Similarly, after one account for molding on the house was opened, the order originally written up in Mr. Kelley's name was later changed to indicate that it was a sale to C & I. Mr. Kelley personally opened an account at a hardware store that did not offer contractor discounts, and he instructed the owner to make all invoices out to IC. In connection with the purchase of concrete from a company owned by the same individual, the company did offer contractor discounts, but no such discount was allowed in its sale to IC for the house construction. The invoice in connection with the sale originally was made out to an individual, but it was later changed *380 so that it was billed to IC. In connection with two subcontracts for the house construction, the subcontractors' laborers were paid by the corporation directly, although this was contrary to the customary practice of one of these subcontractors and was a change from the original arrangement with the other. When the invoices for Mr. Kelley's house construction came to Mr. Haynes for payment, Mr. Haynes observed that the materials were different from those normally purchased by the corporations, and he inquired of Mr. Kelley as to their proper treatment on the books. Mr. Kelley told him to charge them to the Union Camp job. Mr. Kelley told Mr. Haynes that he wanted house expenses to be charged to IC in order to obtain discounts and because it was easier to open accounts in corporate as opposed to individual names. However, there is no explanation in the record as to why Mr. Kelley wanted the invoices to indicate the Union Camp job. No discounts are reflected in the record, and in several cases discounts were not available. On 10 to 15 different occasions, Mr. Haynes asked Mr. Kelley for directions on how to treat other similar house items, and each time was told to charge them *381 to the Union Camp job. After that Mr. Haynes asked Mr. Kelley about this matter only occasionally, because he assumed the answer would be the same. Labor expenses for the house construction were treated in the same manner. On several occasions during 1980 and 1981, Mr. Kelley asked Mr. Haynes to provide him with a summary of residence-related expenses. Mr. Kelley also reviewed the job cost sheets on a regular basis. While the house construction was going on, Mr. Kelley made other personal purchases through the corporations, which were not related to the house construction. On June 13, 1980, Mr. Kelley purchased a personal ownership interest in the Redmont Development Company. He used an IC corporate check in the amount of $ 18,000 to pay for it, and he instructed Mr. Haynes to charge it to the Union Camp job. IC deducted this amount on its 1980 tax return. Mr. Kelley did not report this $ 18,000 as income on his 1980 return. In addition, prior to August 1980, an unrelated company called J & S Insulators (J & S) contracted with C & I to provide insulation panels. J & S dealt exclusively with Mr. Kelley in connection with this contract. Sometime in 1980 the contract was *382 cancelled, and J & S issued a check in the amount of $ 25,000 to resolve a dispute concerning the cancellation. Although the contract had been with C & I, the settlement check was made out to Mr. Kelley. The check amount was never recorded on C & I or IC's books or tax returns, and the $ 25,000 was deposited into Mr. Kelley's personal bank account in August 1980. The $ 25,000 was not reported on Mr. Kelley's 1980 personal income tax return. On November 18, 1980, Mr. Kelley informed Mr. Hullett that he was going to finish the house himself, and Mr. Hullett left the employ of IC. At about the same time the Union Camp job was completed. The total amount of the house expenses included on the Union Camp job cost sheets of the corporate books was $ 199,847.82. They were identifiable to Mr. Haynes as house expenses because he placed red marks next to them on the job cost sheets. House expenses continued to be entered on the books as Union Camp related until May 1981. None of the house-related expenses or the Redmont Development Company purchase were reflected by an adjustment in Mr. Kelley's corporate personal account, and they were maintained on the books of either IC or C & I as *383 business expenses and were deducted on the corporations' tax returns. Mr. Haynes believed that Mr. Kelley was aware that the books inaccurately reflected these personal expenses as Union Camp related and that he was maintaining the books according to Mr. Kelley's instructions. When he turned the books over to the accountant, Mr. Haynes did not inform the accountant of this inaccuracy because he felt that it was Mr. Kelley's responsibility to do so. At no point did Mr. Kelley advise his accountant that a personal residence had been constructed for him from, or that he had made other personal purchases with, corporate funds. None of the house expenses were actually billed to Union Camp. During the period that the house was under construction, the following transactions between Mr. Kelley and the corporations, as reflected in the corporate books, occurred: An increase in the balance owed by Mr. Kelley to C & I, as shown in C & I's 1980-81 "Accounts Receivable-Officers" account, from $ 17,012.36 on December 1, 1980, to $ 52,930.70 on November 30, 1981; a credit to IC's "Note Receivable-Stockholder" account on May 31, 1981, of $ 16,590.15; a $ 43,867.47 credit to C & I's 1981-82 "Accounts *384 Receivable-Officers" account, discussed later in this opinion in connection with the bonus; and a debit in IC's fiscal year ending March 31, 1982, "Note Receivable-Stockholder" account of $ 20,570.14. Entries in other accounts such as those dealing with advances were minimal. IC paid $ 850 in 1980 and $ 4,200 in 1981 to Mr. Kelley's sister, Betty Finch, and treated this sum as a salary expense on the corporate books as well as on the Federal tax returns. Mr. Kelley instructed Mr. Haynes to issue the checks in connection therewith, which were signed by either Mr. Kelley, Mrs. Kelley, or Mr. Haynes. Betty Finch performed no services for IC during 1980 or 1981. Mr. Kelley did not report the amount of these payments to his sister as income on his 1980 or 1981 tax returns. On February 25, 1981, Mr. Kelley opened a bank account in his own name at Birmingham Federal Savings & Loan Association (the Bank), indicating that his home address was on Etowah Street, which was his old house. The initial deposit into that account was $ 288,959.04. Mr. Kelley withdrew $ 30,044.07 from that account on November 17, 1981, and this was the only activity in connection with that account during 1981 *385 except for interest, which was posted on a quarterly basis. During 1981, the account accrued $ 39,338.76 in interest, which the Kelleys received but did not report on their 1981 return. A Form 1099 was issued to Mr. Kelley by the Bank for that amount in January 1982 and sent to the Etowah Street address. On January 8, 1982, Mr. Kelley made an additional deposit to this account from IC funds and then closed the account, transferring the funds therein to three other newly opened accounts. On the signature cards for those accounts, he listed his home address as Etowah Street. Two Bank earnings statements in connection with two of these accounts dated September 30, 1982, show addresses of Etowah Street. Other statements dated December 31, 1982, in connection with the same accounts show Marsh Mountain Road as the address. Several other statements of the latter date also show the Marsh Mountain Road address. No Bank documents in the record show the Marsh Mountain Road address prior to December 31, 1982. In January 1982, the same Bank issued a statement to Mr. Kelley advising him that he had paid $ 1,544.07 in connection with a loan during 1981. The statement listed his address *386 as Etowah Street. Mr. Kelley reported this amount on his 1981 return, although he incorrectly reported it as income. This error was adjusted by respondent in the notice of deficiency. C & I's "Employee Payroll Ledger" sheet, containing an entry on December 27, 1981, shows Etowah Street as Mr. Kelley's address. C & I's corporate fiscal year ran from December 1 to November 30. IC's corporate fiscal year ran from June 1 to May 30. On November 30, 1981, C & I accrued as an expense on its books a salary and bonus amount of $ 91,500, $ 90,000 of which was attributable to Mr. Kelley. Entries on Mr. Kelley's "Payroll Ledger Sheet" of C & I's books indicate that Mr. Kelley was paid on a biweekly basis during 1981, with checks of between approximately $ 850 and $ 865, after reductions for taxes. Entries to this sheet on December 27, 1981, and to various C & I accounts indicate that payment was effected by four methods: (1) A credit for the month ending December 31, 1981, to C & I's account entitled "Accounts Receivable-Officers," showing a $ 43,867.47 reduction of a debt that Mr. Kelley owed to the corporation at that time; (2) a credit for the month ending December 31, 1981, to C & *387 I's "Federal W/H Tax Payable" account in the amount of $ 33,981.40, $ 33,000 of which was on Mr. Kelley's behalf for tax due on the bonus; (3) a credit on December 31, 1981, to C & I's "Alabama W/H Tax Payable" account in the amount of $ 3,730.44, $ 3,600 of which was on Mr. Kelley's behalf for tax due on the bonus; and (4) either in late 1981 or early January 1982, C & I issued a check to Mr. Kelley in the amount of $ 9,532.53. This check probably was dated January 5, 1982. C & I's "Payroll Ledger Sheet" indicates that the bonus was entered on the books on December 27, 1981. Another entry on another page of the "Payroll Ledger Sheet" (apparently referring to the same bonus) indicates a date of January 8, 1982, although this entry seems to have been made at a later date, since it is entered below an entry dated March 28, 1982. Respondent received a 1981 Form W-2 in connection with payment of this $ 90,000 "bonus." On December 1, 1981, C & I had $ 4,179.98 in its operating bank account. During December 1981 this account had credits of $ 21,152.49 and debits of $ 9,990.73. In addition to its operating bank account, when the above entries to C & I's books were made in December *388 1981, C & I owned a certificate of deposit in the amount of $ 180,000, which matured on January 6, 1982. C & I's "Federal W/H Tax Payable" account shows a debit of $ 33,981.40 on January 31, 1982, indicating that the amount withheld in (2) above presumably was paid to the Government on that date. Mr. and Mrs. Kelley filed their 1980 return on June 25, 1981. The street address shown thereon is Etowah Street. On the return they reported income from "Wages, salaries, tips, etc." in the amount of $ 156,662.25. On a schedule attached to the return, $ 1,000 of that amount was from IC, and the balance was from C & I. They did not report on that return $ 163,044 in constructive dividends received by them from IC and C & I for those corporations' payments of personal expenses on their behalf. They also did not report the $ 25,000 constructive dividend received from J & S for the contract settlement. They reported interest in the amount of $ 20,982.04. IC filed a Federal income tax return for its fiscal year ended May 31, 1981, on November 13, 1981. This return was prepared by Mr. Hawley, an outside accountant. The information in the return was obtained from the corporate records *389 maintained by Mr. Haynes, and Mr. Haynes dealt directly with Mr. Hawley in the preparation of the return. Mr. Kelley had little direct contact with Mr. Hawley in connection with preparation of the return, but he did review it and sign it. On the return, IC overstated its cost of goods sold expense by $ 206,507, which amount constituted the personal expenses incurred by IC on behalf of Mr. Kelley. C & I filed its fiscal year 1981 tax return on February 11, 1982. This return also was prepared by Mr. Hawley, based upon information from the corporate records maintained by Mr. Haynes. As with IC's return, Mr. Kelley had little direct contact with the accountant in connection with its preparation other than to review it and sign it. On that return C & I overstated its cost of goods sold expense by $ 16,531, which amount constituted the personal expenses incurred by C & I on Mr. Kelley's behalf during C & I's fiscal year December 1, 1980, to November 30, 1981. The Kelleys filed their 1981 return, which also was prepared by the accountant Mr. Hawley, on April 15, 1982. The information upon which this return was based was supplied to Mr. Hawley by Mr. Kelley. The return showed "Wages, *390 salaries, tips, etc." in the amount of $ 41,580, $ 31,679.96 of which was reflected on a Form W-2 issued by C & I to Mr. Kelley, and $ 9,900.02 of which was reflected on a Form W-2 issued to Mrs. Kelley. There is no indication of income from IC on the return. The Kelleys did not report on this return $ 112,563 in constructive dividends received by them from C & I and IC for the corporations' payments of personal expenses on their behalf. They also did not report the $ 90,000 bonus on this return, although they did report all but approximately $ 7,500 of it on a later return. The address shown on the return is Etowah Street. They did not report the $ 39,338.76 in interest earned on the Bank account, and they incorrectly reported as income the $ 1,544 paid as interest to the Bank. This amount was correctly accounted for in the notice of deficiency. The return also shows a partnership loss from an interest in the Brahman Brangus Breeding Partnership in the amount of $ 7,509. On March 31, 1982, IC and C & I liquidated, and liquidating dividends were paid to Mr. Kelley in exchange for his stock. IC issued Forms 1099L to Mr. Kelley and an IC employee named Larry Blankenship (whose *391 name on the Form 1099L we assume from the parties' silence to be irrelevant), showing liquidating distributions to Mr. Kelley totaling $ 266,820. C & I similarly issued to Mr. Kelley a Form 1099L, showing liquidating distributions totaling $ 219,580. During the time that the corporations were being liquidated, Mr. Kelley experienced health difficulties, which was part of the reason that he determined to go forward with the liquidations. IC and C & I filed final returns in June of that year, which are not at issue herein. On July 5, 1983, the Kelleys and respondent executed a closing agreement in which it was agreed that the Kelleys were allowed a distributive share of the losses from the Brahman Brangus Breeding Partnership in the amount of $ 20,000 for the year 1976. It was further agreed that the Kelleys would not report any losses or deductions in connection with the partnership after 1976. The closing agreement was signed by both Mr. and Mrs. Kelley. During October 1984, respondent's agents, in the course of their investigation of the returns at issue herein, interviewed Mr. Kelley. During that interview, Mr. Kelley informed them that he moved to his new home in 1982. *392 When asked if he had any bank accounts, he told them that he only had some municipal securities or bonds. In connection with this answer, it is not entirely clear whether he was referring to the time frame of the period at issue or the time of the interview. In response to subsequent questioning about the source of funds for his residence, he told respondent's agents that he paid for it from savings. After being informed that respondent was investigating the use of corporate funds to build his house, Mr. Kelley indicated that the house expenses were supposed to have been billed to his personal account. A notice of deficiency was issued by respondent in regard to Mr. and Mrs. Kelley's 1980 and 1981 Federal income tax returns on June 9, 1988. It indicated that Mr. and Mrs. Kelley had understated their 1980 taxable income by failing to report "Constructive Dividends" in the amount of $ 189,524. This figure included expenses incurred by the corporations for the house construction, the $ 25,000 check from J & S, the Redmont Development Company purchase, and the checks to Mr. Kelley's sister. The notice of deficiency also indicated that the Kelleys had understated their 1981 taxable *393 income by failing to report $ 43,189 in "Interest Income," $ 112,789 in "Constructive Dividends" in connection with the house construction and the checks to Mr. Kelley's sister, $ 91,500 in "Salaries and Bonus," and $ 7,509 in "Partnership Income." It also contained other explanations of items which have been resolved by stipulation. [4] For both years, respondent determined that all of the underpayments were due to fraud and applied the addition to tax under section 6653(b). The parties have stipulated that the amount of the 1980 and 1981 sales tax deduction should be adjusted to reflect any changes to their reported adjusted *394 gross income resulting from this litigation and that the Kelleys are entitled to a 1980 net operating loss carryback of $ 52,338 arising from their 1983 year. In addition to stipulations regarding other adjustments not at issue, the parties have stipulated that the Kelleys received constructive dividends in the amount of $ 188,044 in 1980 and $ 112,563 in 1981. Respondent by his silence appears to have conceded the balance of the constructive dividends described in the notice of deficiency. The parties also have agreed that petitioners understated their interest income on their 1981 return as stated by respondent in his notice of deficiency. It also is agreed that petitioners are entitled to an increased interest expense deduction of $ 1,134 on their 1981 return. The parties are in agreement that the $ 90,000 bonus to Mr. Kelley constituted taxable income to the Kelleys. They disagree as to the timing of its inclusion, however. Although the notice of deficiency refers to a bonus of $ 91,500, respondent apparently has conceded $ 1,500 of that amount. We see no record support for inclusion of the $ 1,500 in 1981 in any event. On June 9, 1988, respondent also issued notices *395 of deficiency to IC and C & I, determining that the cost of goods sold amounts on those corporations' tax returns for their fiscal years ending May 31, 1981, and November 31, 1981, in the amounts of $ 206,507 and $ 16,531, respectively, were incorrect because they were "not the Corporation's expenses but those of Mr. & Mrs. Kelley." The notices of deficiency also contained other adjustments not at issue herein. Respondent also determined the addition to tax for fraud. The cost of goods sold adjustments are stipulated to be correct, and all other issues raised in these notices of deficiency have been resolved except for the addition to tax for fraud. As described earlier in this opinion, both corporate petitions have been dismissed on jurisdictional grounds. On September 16, 1988, respondent issued a notice of deficiency to Mr. Kelley as transferee of IC, stating that $ 737,264 was transferred to Mr. Kelley from IC in March 1982 and that Mr. Kelley's "Income Tax Transferee Liability" in connection with IC's tax liability for its fiscal year ending May 31, 1981, was $ 393,726.10. The parties have stipulated that Mr. Kelley as transferee is responsible for the liability of IC for *396 its taxable year ended May 31, 1981, to the extent of $ 266,820, if the statute of limitations is open for such transferee assessment. The amount referred to in the notice of deficiency in excess of that figure appears to have been conceded by respondent. Petitioners filed timely petitions with this Court. By virtue of their extensive stipulations, the issues remaining for decision involve the addition to tax for fraud (and the related statute of limitations question), the inclusion in 1981 of the $ 90,000 bonus, and the partnership loss. OPINION We first must decide whether the addition to tax for fraud applies, for, if it does not, the remaining issues are barred by the statute of limitations. Sec. 6501(a), (c)(1); sec. 6901(a), (c)(1). Section 6653(b) provides for an addition to tax if any part of a year's underpayment is due to fraud. The addition is equal to 50 percent of the amount of the underpayment. The burden of proof as to the fraud issue is on respondent, and he must meet that burden by clear and convincing evidence. Sec. 7454(a); Rule 142(b); Stone v. Commissioner, 56 T.C. 213, 220 (1971). Fraud is defined as an intentional wrongdoing designed *397 to evade tax believed to be owing. Professional Services v. Commissioner, 79 T.C. 888, 930 (1982); Estate of Pittard v. Commissioner, 69 T.C. 391, 400 (1977). Whether fraud exists under a certain set of facts must be determined by an examination of the entire record. Plunkett v. Commissioner, 465 F.2d 299, 303 (7th Cir. 1972), affg. a Memorandum Opinion of this Court. Since it can rarely be established by direct proof, the requisite intent usually must be inferred from the conduct with respect to the transactions in question. Stephenson v. Commissioner, 79 T.C. 995, 1005-1006 (1982), affd. 748 F.2d 331 (6th Cir. 1984); Stone v. Commissioner, supra at 223-224. The likely effect of that conduct must be that which would tend to conceal, mislead, or otherwise prevent the collection of taxes which petitioner knew or believed he owed. Spies v. United States, 317 U.S. 492, 499, 87 L. Ed. 418, 63 S. Ct. 364 (1943); Rowlee v. Commissioner, 80 T.C. 1111, 1123 (1983); Professional Services v. Commissioner, supra at 930. Respondent *398 does not have to prove the precise amount resulting from the fraud, but only that there is some underpayment and that some part of it is attributable to fraud. Otsuki v. Commissioner, 53 T.C. 96, 105 (1969). Respondent argues that the following indicia of fraud are present in this case: Mr. Kelley was intelligent, well versed in tax matters, and generally aware of the manner in which C & I and IC's books were kept; he specifically instructed his employees to deviate from their normal routine by seeing that invoices were falsely coded and by charging his personal expenses to the Union Camp job on the corporate books; he failed to report substantial interest received by him and reported to him on a Form 1099; and he made false statements to respondent's agents during their investigation and at trial. Petitioners contend that respondent has failed to meet his burden of proof on the fraud issue for the following reasons: Mr. Kelley intended to use the corporate books for the construction of his house only as a recordkeeping convenience and to facilitate the opening of accounts and the obtaining of discounts; he merely told Mr. Haynes to "charge" the Union Camp job, *399 and he assumed that the house expenses were being charged to his personal account; he did not hide the construction of his residence from anyone or bill Union Camp for the construction expenses; he did not personally keep the corporate books or prepare the returns at issue and was ill during the time that the returns were being prepared; and he did not report the interest earned on his bank account because he moved in November 1981 to his new residence and did not receive the Form 1099 sent to him by the Bank. We believe that respondent has met his burden of proof on the fraud issue, and that Mr. Kelley intended to build a "tax-free" house. Both Mr. Kelley's individual returns and the corporate returns are the culmination of Mr. Kelley's plan to evade taxes at both the corporate and the individual level by means of diverting corporate funds to his personal use without accurately reflecting them either on the corporate books or on his personal return. The diversion of corporate funds to petitioner's personal use to avoid tax is evidence of fraud. Truesdell v. Commissioner, 89 T.C. 1280, 1303 (1987); Estate of Clarke v. Commissioner, 54 T.C. 1149, 1164 (1970). *400 With regard to his personal returns, Mr. Kelley reviewed the job cost sheets personally and reviewed summaries of house-related expenses from time to time. Thus he clearly was aware of the approximate cost of the house. While he did not maintain the books personally, he was aware of how they generally operated and that the corporations' incurring of these expenses constituted taxable income to him, as evidenced by his statement to respondent's agents during the investigation that the expenses were supposed to be charged to his personal account. While Mr. Kelley attempts to emphasize his lack of formal education as evidence of his lack of knowledge that the returns were false, he clearly was a shrewd and intelligent businessman. Yet his personal returns obviously did not reflect these large amounts of money incurred on his behalf by the corporations. Given the sheer magnitude of the unreported income -- $ 188,044 in 1980, which is more than the gross income reported on the Kelleys' return for that year, and $ 112,563 in 1981, which is almost three times the amount of the Kelleys' salaries reported for that year -- this was clearly not a case of mere inadvertence. A consistent *401 pattern of underreporting large amounts of income is evidence of fraud. See Holland v. Commissioner, 348 U.S. 121, 137, 99 L. Ed. 150, 75 S. Ct. 127 (1954). We also note that the schedule attached to the Kelleys' 1980 return shows that all but $ 1,000 of the salary reported thereon was from C & I. Accordingly, even a cursory review by Mr. Kelley as is alleged to have occurred would have made it clear to him that the expenses incurred by IC on his behalf during that year had not been reflected on his return. The Kelleys' 1981 personal return is even more obvious in that the Forms W- 2 attached thereto contain no reference to IC. The repeated argument that Mr. Kelley believed the corporate books had been adjusted to reflect these expenses thus is irrelevant to his failure to report these large amounts on his personal returns. With regard to the corporate returns, the evidence indicates that Mr. Kelley was not closely involved with their preparation and that they were prepared by an outside accountant. Mr. Haynes provided the accountant with the data necessary to prepare these returns. The "cost of goods sold" figure in a corporate return generally is not obvious, and therefore we have *402 considered Mr. Kelley's contention that he did not know that the corporate returns were false. But any innocence alleged to exist under these circumstances is negated by the fact that, based upon the entire record, we believe the whole arrangement was set in motion by Mr. Kelley to evade taxes from the inception of the house construction. We recognize that many single shareholders of small businesses use their corporations for convenience in handling their personal transactions. There may have been a reason to run the purchases through the corporate books in order to use Mr. Haynes' services to keep track of his house expenses, to more easily open accounts, and to obtain discounts. But Mr. Kelley went much further than that. He instructed his employees to set up invoices that did not reflect the truth and were misleading. One invoice was deliberately changed from a reference to "gutters" to the more misleading term "metal fabrication," a term not commonly used by the subcontractor for gutters. The use of false invoices to increase corporate expenses is evidence of fraud. Miracle Span Corp. v. United States, 1982 U.S. Dist. LEXIS 12518, 82-1 U.S. Tax Cas. (CCH) P9365, 50 A.F.T.R.2d (RIA) 5334 (D.S.D. 1982). *403 Mr. Hullett was not told merely to use the corporate name in making purchases; he was instructed by Mr. Kelley to see that the Union Camp name was included on the invoices. Mr. Hullett's affidavit indicates that Mr. Kelley even became angry when one invoice did not refer to Union Camp. There was no legitimate rationale for charging the invoices to the Union Camp job in order to obtain corporate discounts; a simple reference to the corporation would have sufficed. Moreover, no discounts appear to have been obtained or, in some cases, available. The use of the corporate name was not necessary to open accounts, as evidenced by the fact that some accounts were originally opened under individual names and then later changed to one of the corporate names. Nor is there any explanation for Mr. Kelley's insistence upon the payment of construction workers directly, rather than paying them in the customary manner through the contractor. This would appear to be an additional attempt to mask the true purpose of the payments as they were less easily traced to the house construction. Similarly, there was no reasonable explanation for recording the materials purchases in the job cost sheets *404 of the corporate books. If Mr. Kelley had merely intended to use the services of his bookkeeper to keep track of the house expenses, this could have been accomplished much more efficiently in a separate listing. This further convinces us that the use of the corporate records was not merely for convenience but was designed to hide the truth. Respondent claims that Mr. Kelley knew that the corporate books had not been correctly adjusted to reflect the corporate purchases on Mr. Kelley's behalf. Petitioners contend that Mr. Kelley did not instruct the bookkeeper Mr. Haynes to refrain from reflecting the house and other personal expenses in the officer's personal account and that failure to make these entries on the corporate books was the result of a misunderstanding or error on Mr. Haynes' part. We hold that respondent has proven his contention. At one point during cross-examination, Mr. Haynes stated that Mr. Kelley did not tell him not to include the house and other personal expenses in the personal account. He further indicated that he was merely following Mr. Kelley's instructions of charging the expenses to Union Camp, admitting that it could have been a mere miscommunication *405 between him and the accountant. Earlier in his testimony, however, he indicated that Mr. Kelley was aware that the personal account did not reflect the personal expenses. There seems to be an inherent inconsistency in Mr. Haynes' testimony, which causes it to be somewhat unreliable. However, as we have discussed, the plan set in motion by Mr. Kelley to tailor the corporate records in connection with the house expenses to make them appear to be legitimate corporate expenses is highly indicative of knowledge. His statement at trial that he did not know that the expenses had not been charged to his personal account is also difficult to believe in view of the fact that there apparently were not many large transactions between Mr. Kelley and the corporations during this period. [5] The adjustments in the corporate records concerning loans or advances between Mr. Kelley and the corporations do not even begin to approximate the size of the constructive dividend amount at issue herein. Thus this was not a minor amount, "hidden" among many other complex transactions, which might have confused him. In addition, Mr. Kelley's personal return was filed before the corporate returns. As we *406 have found, Mr. Kelley was aware that his personal return did not reflect the personal expenses incurred by the corporations on his behalf. Yet he made no effort to identify the problem with his accountant and determine whether the same mistake had occurred in connection with the corporate returns. From this and other evidence in the record, we conclude that Mr. Kelley was aware when he filed the corporate returns that they did not reflect the truth. We also are not inclined to give much credence to Mr. Kelley's testimony of his innocence in this regard because his statements were so inconsistent that we are unable to call them reliable. For example, in the course of respondent's investigation of Mr. Kelley's returns, he first told respondent's agents that he built his new house from "savings"; *407 then, when they showed him proof that the house had been built from corporate funds, he indicated that the house was supposed to have been charged to his personal account; then at trial he expressly denied telling the agents that he had built the house from savings. We have no reason to doubt the truthfulness of respondent's agents. It would appear that Mr. Kelley had a different picture depending upon the corner into which he had painted himself. False and misleading statements to respondent's agents are indicative of fraud. Grosshandler v. Commissioner, 75 T.C. 1, 20 (1980). We find that during the investigation he was attempting to divert the discussion away from scrutiny of the corporations' purchase of house construction materials because he was very aware of the falsity of the returns. Additional evidence of fraud is present in Mr. Kelley's dealings with his accountant. The accountant was not advised by either Mr. Haynes or Mr. Kelley that substantial personal expenses had been incurred by the corporations, which had not been reflected in the personal accounts. Mr. Haynes indicated that, because Mr. Kelley was aware of this, he felt that it was Mr. *408 Kelley's responsibility to inform the accountant. Since we have found that Mr. Kelley was so aware, it was incumbent upon him to contact the accountant about it, which he failed to do. In connection with his 1981 personal return, the accountant dealt directly with Mr. Kelley, who once again did not disclose the fact that the corporations had made substantial personal purchases on his behalf. Mr. Kelley thereby provided his accountant with this false information for preparation of the 1981 individual return, which is further evidence of fraud. Korecky v. Commissioner, 781 F.2d 1566, 1569 (11th Cir. 1986), affg. per curiam a Memorandum Opinion of this Court; Foster v. Commissioner, 391 F.2d 727, 732-733 (4th Cir. 1968), affg. a Memorandum Opinion of this Court; Farber v. Commissioner, 43 T.C. 407, 420 (1965). Additional evidence of Mr. Kelley's lack of veracity and otherwise fraudulent behavior is evident in connection with his failure to report substantial interest on his 1981 return. Mr. Kelley contends that he did not report the $ 39,338.76 interest earned on his Bank account because he did not receive a Form 1099 *409 from the Bank reflecting that interest. He claims that this occurred because he moved in 1981 and inadvertently failed to change his mailing address with the Bank. Firstly, we do not believe Mr. Kelley's statement at trial that he moved prior to 1982. The dates of the invoices in the record indicate that kitchen appliances were paid for in August 1981 (and thus were probably already installed), but there is no evidence in the record of the Kelleys' moving date. Other facts, however, indicate that it was highly unlikely that they moved before 1982. Their 1981 return, filed on April 15, 1982, shows Etowah Street (the old house) as their address. Mr. Kelley's dealings with the Bank indicate that he did not change his official address until much later in 1982. C & I records containing entries as late as December 27, 1981, show Etowah Street as his address. He told respondent's agents in his initial interview with them that he moved in 1982. Furthermore, it defies reality that Mr. Kelley could deposit funds to this account in late 1981 and then in January 1982 transfer all the funds in that account to newly opened accounts bearing his old address if he had moved in 1981 to his *410 new house. Moreover, the Kelleys reported as income the $ 1,544.07 they paid as interest to the Bank, indicating that they received the notice sent to their old address in January 1982, the same time that the Bank sent them the Form 1099 they allegedly never received. Accordingly, we do not believe that Mr. Kelley did not receive the Form 1099 sent by the Bank to his Etowah Street address because he had already moved. Secondly, even if he did not receive the Form 1099, we cannot imagine that such a large sum could be innocently "overlooked," particularly when he had recent substantial dealings with the account which would have alerted him to its substantial size. We conclude that Mr. Kelley is once again attempting to present an innocent explanation for his failure to report substantial income, but once again the explanation does not comport with logic. Finally, two additional pieces of evidence further convince us that Mr. Kelley is not the innocent victim he claims to be. Mr. Kelley further attempted to bypass the taxation of ordinary income by depositing the $ 25,000 settlement check from J & S Insulators into his personal account without reporting it either on his personal *411 return or the corporations' returns, which is yet another example of his flagrant disregard for the tax laws. In addition, the parties have stipulated that a substantial amount of corporate funds was paid in 1980 and 1981 to Mr. Kelley's sister as a "salary," and deducted on the corporate returns, when that individual did not do any work for the corporations during those years. These payments were made at Mr. Kelley's instruction, and Mr. Kelley has made no argument that these payments were legitimate corporate expenses. This was yet another "detail" in the general scheme to withdraw profits from the corporations under the guise of legitimate corporate expenses. Such an action is further evidence of fraudulent intent. Meyers v. Commissioner, 21 T.C. 331, 348-349 (1953). In sum, we find that the cumulative weight of all these factors has established Mr. Kelley's fraud by clear and convincing evidence in docket No. 23020-88. Accordingly, the statute of limitations is not a bar with respect to that proceeding. Sec. 6501(c)(1). In docket No. 32292-88, respondent determined Mr. Kelley's liability for deficiencies and the addition to tax for fraud as transferee *412 of IC for the fiscal year ending May 31, 1981. Normally, respondent bears the burden of proving that the petitioner is liable as a transferee of property of another taxpayer. Sec. 6902(a). In this case, however, the parties have stipulated that Mr. Kelley as transferee is responsible for the liability of IC if the statute of limitations is open for such transferee assessment. Thus, the sole issue is whether the transferor, IC, is liable in the first instance for the fraud addition to tax. As previously noted, respondent must prove fraud by clear and convincing evidence. Sec. 7454(a). We find that respondent has established by clear and convincing evidence IC's liability for the fraud addition to tax. Specifically, where, as here, a corporation is dominated and controlled by a sole shareholder-officer who is well aware that false and fraudulent corporate returns have been filed, the shareholder-officer's fraudulent intent is imputed to the controlled corporation. American Lithofold Corp. v. Commissioner, 55 T.C. 904, 925-926 (1971). Because of this imputed fraud, the statute of limitations is not a bar with respect to this proceeding either. Secs. 6501(c)(1), *413 6901(c)(1). Consequently, we find Mr. Kelley liable for the deficiencies and addition to tax for fraud in his capacity as transferee of IC. We now reach the remaining issues. Petitioners bear the burden of proof. Rule 142(a). With regard to the partnership question, we fail to understand why the parties did not add this to their extensive stipulation. The Kelleys took a deduction on their 1981 return in the amount of $ 7,509 in connection with the Brahman Brangus Breeding Partnership. Two years later, they executed a closing agreement with respondent wherein they agreed that a $ 20,000 deduction was allowed for the year 1976 but no losses resulting from their investment in that partnership would be allowed thereafter. The only argument that the Kelleys make with respect to this issue is that respondent did not show that they had received the full benefit of the $ 20,000 deduction. However, the closing agreement contains no provision entitling them to any deduction except during 1976. Section 7121(b) provides that a properly approved closing agreement shall be final and conclusive, and, except upon a showing of fraud or malfeasance, or misrepresentation of a material *414 fact -- (1) the case shall not be reopened as to the matters agreed upon * * *, and (2) in any suit, action, or proceeding, such agreement * * * shall not be annulled, modified, set aside, or disregarded.
There is no claim by petitioners that there has been any legitimate reason under the standard set forth above to disregard the closing agreement. Accordingly, respondent correctly denied the deduction. We also note that, although there was no fraud in connection with this aspect of the deficiency in docket No. 23020-88, section 6653(b), as in effect during 1981, provided that, "If any part of any underpayment" is due to fraud, the addition to tax is 50 percent of "the underpayment" (emphasis added). Thus the fraud addition to tax applies with respect to this part of the deficiency as well. As to the wage/bonus payment, petitioners contend in essence that, because C & I had only $ 4,179.88 in its bank account on December 1, 1981, it cannot have "paid" to the Kelleys a bonus of $ 90,000 until the following year, when C & I's certificate of deposit matured and the corporation had substantial cash available. We do not agree. In view of the fact that the wage/bonus *415 at issue herein was actually or constructively "paid" to Mr. Kelley in four separate ways, it is necessary to examine each separately. The first method of payment on the corporate books was by means of Mr. Haynes' adjustment of the loan account between C & I and Mr. Kelley. The corporate account entitled "Accounts Receivable-Officers" was credited on December 31, 1981, in the amount of $ 43,867.47 to reflect a partial payment of a debt owed by Mr. Kelley to C & I. This adjustment to the corporate books constituted income from discharge of an indebtedness owed by Mr. Kelley to C & I. Sec. 61(a)(12). The discharge occurred on December 31, 1981 -- the date when the adjustments to the corporate books were made and the discharge was complete. United States v. Ingalls, 399 F.2d 143, 147 (5th Cir. 1968); Newmark v. Commissioner, 311 F.2d 913, 915 (2d Cir. 1962), affg. a Memorandum Opinion of this Court. The facts before us are very similar to those in Lehew v. Commissioner, T.C. Memo 1987-389, where an insurance salesman's commissions were paid to him by means of a credit to his outstanding advances account. We stated: *416 When the advances were made to Mr. Lehew, he was not taxable on them because they were in effect loans. However, when the commissions earned by him in 1980 were credited to his account, his obligation to repay the loans was reduced by that amount, and the reduction of that obligation did constitute the receipt of gross income. [Citations omitted.]
T.C. Memo 1987-389, 1987 Tax Ct. Memo LEXIS 386, 54 T.C.M. (CCH) 81, 82, T.C.M. (RIA) 87389, at 2000. Similarly, when the adjustments to C & I's books occurred on December 31, 1981, Mr. Kelley owed C & I $ 43,867.47 less than he did before. Therefore, he received income in 1981 in the amount of the adjustment. The second means of effecting payment of the bonus to Mr. Kelley was by means of adjustments to two C & I accounts regarding Federal and State tax withholding. To these accounts, Mr. Haynes entered credits on December 31, 1981, in the amounts of $ 33,981 and $ 3,730.44, respectively, $ 33,000 and $ 3,600 of which were attributable to Mr. Kelley. These amounts represented funds that were required to be withheld and paid over to the Federal and Alabama State Governments at a future time. This situation is very similar to that in Basila v. Commissioner, 36 T.C. 111 (1961), *417 wherein a book entry for a cash basis taxpayer's withholding was treated as constructively received in the year in which the income to which the withholding was attributable was received, even though the entry did not occur and the money was not paid over to the Government until the the following year. The reasoning used there was that it was presumed that the payor/corporation and the payee/taxpayer knew that withholding was required and intended to comply with the tax laws. Even though the corporate books did not show the withholding amount at the time the income was paid to the taxpayer, the entry on the corporate books constituted income in the year to which the withholding was attributable because the taxpayer's income actually exceeded the amount that was paid by the amount that should have been withheld. The fact that the corporation did not pay the withholding over to the Government until the following year was immaterial. 36 T.C. at 118-119. Applying that reasoning to the facts of this case, Mr. Haynes' withholding tax adjustments were part of the bonus that Mr. Kelley received in 1981, because he was required to pay Alabama and Federal taxes on the bonus *418 as entered on the corporate books. In effect, what really happened was a receipt by Mr. Kelley of $ 36,600 of the bonus in 1981, and a payment back to C & I of the $ 36,600 State and Federal income taxes required to be withheld in connection with the bonus. Accordingly, the amounts of the book entries also were income to the Kelleys in 1981. Lastly, we must consider the balance of the wage/bonus payment in the amount of $ 9,532.25. The evidence concerning the date of the check for this amount is inconsistent. The Kelleys contend that the check for this amount was not issued to Mr. Kelley until 1982, and respondent's agent indicated that he thought it was dated January 5, 1982. This is contrary to the statement of Mr. Haynes that his standard procedure was to issue a check at the same time that he made corporate entries. However, we need not decide this factual issue because, even if the check was dated 1982, the law of constructive receipt would require its inclusion in 1981. As applied to cash basis taxpayers (and there is no evidence that the Kelleys were not), "Gains, profits, and income are to be included in gross income for the taxable year in which they are actually *419 or constructively received by the taxpayer." Sec. 1.451-1(a), Income Tax Regs. Income is constructively received by the taxpayer "in the taxable year during which it is credited to his account, set apart for him, or otherwise made available so that he may draw upon it at any time." Sec. 1.451-2(a), Income Tax Regs. Thus actual receipt is not necessary for there to be income. The check amount was credited to his account by means of a book adjustment in 1981 and thus was constructively received during that year. Petitioners appear to argue that the doctrine of constructive receipt does not apply, however, where the payor lacks the funds to make the payments. Estate of Noel v. Commissioner, 50 T.C. 702, 706-707 (1968). They claim that, because it had only $ 4,179.98 in its operating bank account on December 1, 1981, C & I lacked the funds to pay this check. This fails to recognize two important facts. First, the relevant date is not December 1, 1981, but December 31, 1981. While the corporation did have only a little more than $ 4,000 in its operating bank account on December 1, C & I's deposits to that account during the month of December exceeded its withdrawals *420 by more than $ 10,000, so that C & I would have been able to issue the $ 9,532.25 check and the Kelleys would have been able to cash it if they had wanted to. White v. Commissioner, 61 T.C. 763, 767 (1974). A taxpayer "may not deliberately turn his back upon income and thus select the year for which he will report it." Willits v. Commissioner, 50 T.C. 602, 612 (1968), quoting Hamilton National Bank of Chattanooga v. Commissioner, 29 B.T.A. 63, 67 (1933). More importantly, the record shows that on December 31, 1981, C & I owned a certificate of deposit in the amount of $ 180,000, which was to mature a few days later. To claim that these funds were "unavailable" until maturity is an inaccurate description of the status of those funds. Rather, they were available for a fee--a penalty for early withdrawal. Moreover, they were certainly available as security for a loan, should that have proven to be necessary. See Geiger & Peters, Inc. v. Commissioner, 27 T.C. 911, 919 (1957). Accordingly, the entire amount of the $ 90,00 bonus was income to the Kelleys in 1981. Decisions will be entered under Rule *421 155. Footnotes
1. The cases of petitioners were consolidated for purposes of trial, briefing, and opinion on October 23, 1989. At that time, two other docketed cases, Insulation Contractors, Inc., docket No. 22822-88, and Commercial and Industrial Insulation Co., Inc., docket No. 22909-88, were consolidated therewith. On June 4, 1991, the Court severed the latter two cases from the consolidated group and entered orders dismissing them for lack of jurisdiction on the ground that they had no capacity under applicable State law to engage in the instant litigation. The corporate petitioners in those two cases were dissolved prior to the date their petitions were filed. ↩
2. Unless otherwise noted, all section references are to the Internal Revenue Code of 1954 as amended and in effect for the years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.↩
3. In docket No. 23020-88, respondent has conceded that there are no 1980 or 1981 additions to tax under section 6653(b) as to petitioner Gail B. Kelley. ↩
4. The notice of deficiency indicates the following computations in connection with the Kelley's 1982 return, which is not before the Court: ↩
Salaries and Bonus Computations
Unpaid salary for FYE 11-30-81 C & I
$  91,500
Unpaid salary for FYE 03-31-82 C & I final
14,393
Total to 1982 calendar year $ 105,893
W-2 for 1982 and 1040 shows
98,529
Salary unreported for 1982
$   7,364
5. While IC's records indicate that Mr. Kelley had loaned IC more than $ 181,000 in earlier years, that loan apparently had been eliminated by the end of May 1980. Thus any potential confusion was thereby eliminated as well.↩